MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

KIRSTIN M. AULT (CABN 206052)
THOMAS E. STEVENS (CABN 168362)
Assistant United States Attorneys

450 Golden Gate Ave., Box 36055
San Francisco, California 94102
Telephone: (415) 436-6940
Facsimile: (415) 436- 7234
E-mail: kirstin.ault@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No.   CR 10-0642 CRB |
| Plaintiff, | ) ) | UNITED STATES' SENTENCING MEMORANDUM FOR MICHAEL ARNOLD AND |
| v. | ) ) | MOTION FOR UPWARD DEPARTURE |
| CHRISTOPHER NAPOLI, DANIEL JOHNSON, SALVATORE LAMORTE, JEFFREY ENTEL, JOSEPH CAROZZA, JEFFREY HERHOLZ, DARRELL CREQUE, MICHAEL ARNOLD, and DINO ANTONIONI, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Recommended Sentence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    Sentencing Guidelines.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         1.    Base Offense Level: Drug Trafficking.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

         2.    Mass Marketing/Interactive Computer Service. . . . . . . . . . . . . . . . . . . . . . 6

         3.    Excessive Drug Quantity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

         4.    Role: Drug Trafficking.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         5.    Base Offense Level: Money Laundering. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         6.    Sophisticated Laundering.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         7.    Role: Money Laundering. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         8.    Acceptance of Responsibility.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    18 U.S.C. § 3553(a) Factors.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

         1.    Nature and Circumstances of the Offense. . . . . . . . . . . . . . . . . . . . . . . . . 11

             a.    Death or Serious Bodily Injury. . . . . . . . . . . . . . . . . . . . . . . . . . 12

         2.    History and Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . . 15

         3.    Seriousness of the Offense, Respect for the Law, Just Punishment, Adequate Deterrence, Protection of the Public Rehabilitation of the Defendant.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         4.    Sentencing Commission Policy Statements.. . . . . . . . . . . . . . . . . . . . . . . 17

         5.    Unwarranted Sentencing Disparity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         6.    Restitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Gall v. United States,* 552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 16-18

*United States v. Bartlett,* 567 F.3d 901 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Jones,* 696 F.3d 695 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Ressam,* 679 F.3d 1069 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4, 18

*United States v. Yi,* 2013WL11890 (9th Cir., Jan. 2, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**FEDERAL STATUTES, RULES AND GUIDELINES**

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 2D1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-7

U.S.S.G. § 2S1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

U.S.S.G. § 3B1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7-9

U.S.S.G. § 3D1.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. §3D1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. § 3D1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. § 5K2.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

U.S.S.G. § 5K2.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

U.S.S.G. § 5K2.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**INTRODUCTION**[1]

The United States respectfully recommends a sentence of 120 months for defendant Michael Arnold.  The United States believes that this sentence, while below the applicable Guidelines' range, appropriately accounts for the seriousness of the offense, the history and characteristics of the defendant, the need to promote justice and respect for the law, and the need to avoid unwarranted sentencing disparities with persons convicted of similar offenses who have similar criminal backgrounds.

Of all of the defendants charged in the indictment, Arnold's conduct is the most egregious - it lasted the longest, made the most money, and resulted in the distribution of the most controlled substances.  In addition, Arnold is the only defendant with a conviction for a computer-related crime in his criminal history.  Therefore, Arnold should receive one of the longest prison sentences among his co-conspirators.

A sentence of 33 months, as proposed by the defendant does not adequately address any of the factors established in 18 U.S.C. § 3553(a).  Most importantly, a sentence of such short duration would encourage others to engage in similar crimes because the benefit of the large amount of money to be made from selling illegal drugs over the Internet could be seen as worth the risk of the relatively short prison sentence that might result from committing this type of crime.

The defendant's argument that he was not an organizer, manager or leader of Pitcairn is belied by the evidence introduced at trial and the jury's verdict.   Arnold's assertion that a 33-month sentence is justified largely by comparison to sentences handed down by other courts in Internet pharmacy cases is supported only by reference to defendants who were convicted of different crimes, involving different factual bases, with different criminal histories who pled guilty prior to trial and who cooperated with the United States.  The Supreme Court and Ninth Circuit have expressly held that comparison to such dissimilarly situated defendants does not

---

[1]    The Probation Officer has not yet disclosed the final PSR.  Therefore, the United States is unable to register any objections to the PSR in this memorandum.

U.S. SENTENCING MEMORANDUM
CR 10-0642 CRB                                1

justify a reduced sentence in the name of avoiding "unwarranted" sentencing disparities.

A sentence of 120 months is the just and appropriate sentence in this case, and the United States respectfully urges the Court to impose this term of imprisonment, followed by 3 years of supervised release, an appropriate fine, and a $600 special assessment.  The United States further requests that the Court order that the defendant forfeit $ 69,692,488.39 in criminal proceeds, including the specific accounts identified in the Court's preliminary order of forfeiture dated December 31, 2012, as amended on January 4, 2013.  Clerk's Record ("CR") 1092 and 1094.

**BACKGROUND**

On August 31, 2010, the grand jury returned a 13-count indictment charging eleven defendants[2] with drug trafficking and international money laundering in connection with three separate but related Internet pharmacy operations: SafescriptsOnline, Pitcairn, and United Mail Pharmacy Services ("UMPS").  Clerk's Record ("CR") 1.  On December 7, 2010, a superseding indictment was returned that made only minor technical changes to the indictment.  CR 144.

On August 24, 2011, Salvatore Lamorte and Darrell Creque entered guilty pleas and agreed to cooperate with the United States.  CR 307, 308.  On June 1, 2011, the Court ordered that the counts charging the three separate Internet pharmacies would be severed for trial.  CR 252.  On June 22, 2011, the Court further ordered that the charges involving the Pitcairn Internet pharmacy would proceed to trial first.  CR 264.

On February 2, 2012, trial involving the Pitcairn-related charges commenced. CR 558.  On March 1, 2012, Michael Arnold and Jeffrey Herholz[3] were found guilty of conspiracy to distribute Schedule III and IV controlled substances, in violation of 21 U.S.C. § 846, and conspiracy to launder money internationally, in violation of 18 U.S.C. § 1956.  CR 645.  Arnold

---

[2]    Two defendants, Steven Paul and Diego Paes, will not be sentenced.  The case against Paul was dismissed upon suggestion of death on March 7, 2011.  CR 221.  Paes, a citizen of Brazil, remains a fugitive.

[3]    The remaining defendants charged in these counts had either pled guilty (Lamorte and Creque) or were fugitives (Paes).

U.S. SENTENCING MEMORANDUM
CR 10-0642 CRB                                2

was also convicted of four substantive counts of distributing the Schedule IV controlled substance phentermine, in violation of 21 U.S.C. § 841(a)(1), based on four undercover purchases that were made from Pitcairn. *Id.* Herholz was not charged in these substantive counts because the drugs were not shipped from Herholz's pharmacy Kwic Fill, but from its sister pharmacy United Care Pharmacy. CR 144.

On March 2, 2012, the Court ordered that trial of the Safescripts-related counts would commence on April 9, 2012. CR 650. That trial date was eventually continued to October 1, 2012. CR 881.

On April 11, 2012, Dino Antonioni and Jeffrey Entel entered a guilty pleas. CR 698, 702. Entel agreed to cooperate with the United States. CR 698. On that date, Jeffrey Herholz entered guilty pleas to the remaining counts without a plea agreement. CR 701.

On October 1, 2012, trial involving the Safescripts-related charges commenced. CR 920. On November 15, 2012, all defendants were found guilty on all counts. CR 1068.

The Court held sentencing of all defendants in abeyance pending resolution of all charges because the Court wished to sentence all defendants at the same time. Arnold Trial Transcript ("ATT"), p. 2940. Following the conviction of the Safescripts defendants, the Court set sentencing for all defendants for February 20, 2013. CR 1078. On December 11, 2012, the Court advanced the sentencing of defendant Arnold to January 23, 2013 at the defendant's request and over the United States' objection. CR 1083. The remaining defendants are scheduled to be sentenced on February 20, 2013.

**DISCUSSION**

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (*en banc*); 18 U.S.C. § 3553(a)(2). The Court should begin the sentencing process by correctly calculating the applicable Guidelines' range and

must "remain cognizant of them throughout the sentencing process." *Id.*; *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). The Court should then consider the factors outlined in §3553(a) to determine the appropriate sentence. *Ressam*, 679 F.3d at 1089. If the Court determines that a sentence outside of the Guidelines' range is warranted, the "justification must be sufficiently compelling to support the degree of the variance" such that "a major departure should be supported by a more significant justification than a minor one." *Id.*; *Gall*, 552 U.S. at 50.

**A.    Recommended Sentence**

Statutory Maximum: 47 years (564 months)

Counts 4-8:  Offense Level 32, CHC I (121-151 months)

Count 9: Offense Level 34, CHC I (151-188 months)

Recommended Sentence: 120 months

**B.    Sentencing Guidelines**[6]

The Sentencing Guidelines are correctly calculated as follows:

| Guideline | Factor | Offense Level |
|---|---|---|
| *Drug Trafficking*  (21 U.S.C. § 846, 841(a)(1)) - Counts 4-8 | | |
| 2D1.1(a)(3)(c)(10) | Base offense level: 40,000 or more units of Schedule III controlled substances | 20 |
| 2D1.1(b)(5) | Mass marketing/use of interactive computer service | +2 |
| 2D1.1 App. Note 16 | Drug quantity substantially exceeds quantity for highest offense level | +4 |

[6]    The Sentencing Commission amended the Guidelines beginning in 2009 to implement an increase in the base offense level to 26 for distribution of a Schedule III or IV substance that resulted in death or serious bodily injury. *See* U.S.S.G. § 2D1.1(a)(4) (2009). Prior to this amendment, there was no specific increase in the Guidelines for death or serious bodily injury resulting from the distribution of Schedule III or IV controlled substances. *See* U.S.S.G. § 2D1.1 (2006). Instead, the Guidelines' policy statements called for an unspecified increase in the defendant's sentence when death or serious bodily injury resulted from the offense. *See* U.S.S.G. § 5K2.1, 5K2.2 (2006). To avoid Ex Post Facto concerns, the United States is not using the increased base offense levels for death or serious bodily injury implemented in 2009.

U.S. SENTENCING MEMORANDUM
CR 10-0642 CRB                        4

| 3B1.1(a) | Role: Organizer, manager or leader of enterprise involving 5 or more persons | +4 |
|---|---|---|
| **Total Drug Offense Level** | | **30** |
| *Money Laundering Conspiracy* (18 U.S.C. § 1956) - Count 9 | | |
| 2S1.1(a)(1) | Base offense level: underlying offense from which funds were derived | 26 |
| 2S1.1(b)(2) | Defendant convicted of § 1956 | +2 |
| 2S1.1(b)(3) | Sophisticated laundering | +2 |
| 3B1.1(a) | Role: Organizer, manager or leader of criminal activity involving 5 or more persons | +4 |
| **Total Money Laundering Conspiracy Offense Level** | | **34** |
| 3D1.2(d), 3D1.3(b), 3D1.4 | Apply group with highest offense level | 34 |
| **Adjusted Guidelines Range** | CHC = I | **151-188** |

The rationale for the Guidelines calculation set forth above is explained below:

1.      Base Offense Level: Drug Trafficking

The base offense level of 20 is the highest offense level for the distribution of Schedule III controlled substances and applies when the conduct involves the distribution of over 40,000 doses.  A base offense level of 12 applies to the distribution of over 40,000 Schedule IV controlled substances.

All told, Pitcairn earned $69,692,488.39 in sales of illegal controlled substances.  Arnold personally made over $10 million from this Internet pharmacy business in just 4 years. Based on Pitcairn's financial records, a very conservative estimate of the total amount of drugs distributed by Pitcairn is as follows[7]:

///

---

[7]      Where the amount of drugs seized do not reflect the scale of the offense, as occurred here, the court shall approximate the quantity of the controlled substance.  U.S.S.G. § 2D1.1, App. N. 5.  The court may consider financial records, the price generally obtained for the controlled substance and similar records to approximate the drug quantity involved in the offense.  *Id.*

U.S. SENTENCING MEMORANDUM
CR 10-0642 CRB                                    5

| | |
|---|---|
| Total Revenue for Pitcairn:<br>(Trial Exhibit 43) | $69,692,488.39 |
| Number of Orders:<br>($69,692,488.39/$150)<br>(Total revenue divided by a conservative<br> average order price of $150 per order) | 464,617 total orders |
| Number of Controlled Substance Orders :<br>(98% of 464,617 )<br>(Based on average of 98% controlled substances;<br>Trial Exhibits 124C & 133C ) | 455,324 |
| Number of Controlled Dosage Units:<br>(455,324 x 30)<br>(Based on a conservative average order of 30 pills) | 13,659,720 |
| Schedule III Controlled Substances:<br>(6% of 13,659,720)<br>(Based on average of 6% Schedule III orders;<br>Trial Exhibits 124C & 133C) | 819,584 |
| Schedule IV Controlled Substances:<br>(94% of 13,659,720)<br>(Based on average of 94% Schedule IV orders;<br>Trial Exhibits 124C & 133C) | 12,840,136 |

This conservative estimate far exceeds the 40,000-pill cap for base offense level 20.

2.      Mass Marketing/Interactive Computer Service

A two-level enhancement applies where the defendant "distributed a controlled substance through mass-marketing by means of an interactive computer service." U.S.S.G. § 2D1.1(b)(7). As set forth in the application notes, this enhancement applies where a defendant uses a website to illegally promote the sale of a controlled substance. U.S.S.G. § 2D1.1, App. N. 13. This enhancement defines the business model that Arnold used to distribute drugs through Pitcairn.

3.      Excessive Drug Quantity

The Sentencing Guidelines state that an upward departure may be warranted where the quantity of drugs distributed substantially exceeds the quantity for the highest offense level established for that particular controlled substance. U.S.S.G. § 2D1.1, App. N. 26(B). In this case, the quantities Arnold actually distributed exceeded by significant multiples the 40,000-pill cap established in the Guidelines. Arnold's distribution of over 800,000 Schedule III controlled

substances is 20 times the Guidelines' maximum for level 20, and his distribution of over 12 million pills of Schedule IV controlled substances is over 300 times the maximum quantity of 40,000 pills for the highest offense level of Therefore, an upward departure is warranted. The United States believes that a 4-level increase appropriately accounts for the fact that Arnold's conduct was substantially more egregious than the most serious offense contemplated by the Guidelines.

    4.    Role: Drug Trafficking

A 4-level increase applies because Arnold was an organizer or leader of a criminal activity that involved five or more participants. U.S.S.G. § 3B1.1(a). Pitcairn was a world-wide organization that involved substantially more than the five participants contemplated by this Guideline. The evidence at trial established that Arnold's criminal enterprise involved at least the following ten participants: Diego Paes, Salvatore Lamorte, Jeffrey Herholz, Alfred Valdivieso, Tom Russo (United Care Pharmacy), Maher Ishak (Woodbury Pharmacy), Charlotte Lopacki (Budget Drugs), David John, Brandon Winstead, and Matthew Bagley (affiliate).

The evidence at trial further established that Arnold was an organizer, manager or leader of Pitcairn. First, Arnold made more money than any other participant in the conspiracy, including Diego Paes ($10,603,505 as compared to Paes' $7,259,457). *See* Ex. 1. Second, he recruited Alfred Valdivieso to review drug orders for Pitcairn and managed that relationship, including monitoring the number of orders Valdivieso was reviewing and prompting him to review more orders more quickly. Third, he managed the money for Pitcairn. *See*, e.g. Ex. 2 (Trial Ex. 130 in which Diego Paes refers money matters to "Mike"; Trial Ex. 542D in which Arnold arranges payments for United Care Pharmacy; and Trial Exs. 409-410 in which Arnold controls the flow of funds to and from Echo International, an account held in the nominee name of Eugene Herbert).

Contrary to Arnold's assertion he was not a "consultant" for Pitcairn. The evidence at trial demonstrated that he held a leadership role. Moreover, the exact consulting agreement that Arnold introduced to establish his "consultant" status was the same consulting agreement that

Diego Paes also provided to a bank to establish that he too was a "consultant." If both Arnold and Paes were "consultants" to Pitcairn, then there was noone actually running the business. The jury clearly rejected the idea that Arnold was only a "consultant" to Pitcairn rather than a manager and leader who was intimately involved with the day-to-day operations of Pitcairn's illegal business. Instead, the evidence introduced at trial demonstrated that Arnold's assertions that he was a "consultant" were intended to hide his connection to Pitcairn and the fact that the true source of his income was from the illegal sale of controlled substances over the Internet. For example, Arnold claimed to his account Kim Ecklond that the income for his business vSecure Networking was the result of "consulting fees" earned for Direct Connect International. Direct Connect, however, was a shell corporation created by Arnold to launder his Internet pharmacy money.

     5.     Base Offense Level: Money Laundering

The base offense level for the money laundering count is derived from the base offense level for the underlying crime from which the funds were derived, which in this case is the drug trafficking conspiracy. U.S.S.G. § 2S1.1(a)(1). Level 26 is used because the "base offense level" in this context means the offense level after all "specific offense characteristics, cross references, and special instructions" have been applied. U.S.S.G. §1B1.5(b)(1). This does not apply to Chapter 3 enhancements, such as that for role. U.S.S.G. § 2S1.1, App. N. 2(C).

     6.     Sophisticated Laundering

A two-level enhancement is applied for sophisticated laundering, which typically involves "(i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e. layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." U.S.S.G. § 2S1.1, App. N. 5(A). As demonstrated at trial, Arnold's conduct involved all of these factors.

     7.     Role: Money Laundering

A four-level increase to the money laundering guidelines is appropriate because Arnold played a leadership role in a money laundering organization that involved 5 or more participants

or was otherwise extensive.  As demonstrated at trial, Arnold's international money laundering organization required the involvement of at least 5 individuals, including: Diego Paes (Brazil), Juan Montes and/or Beth Grey (Panama), Viet Frommelt and/or Tom Kohli (Liechtenstein), Salvatore Lamorte (Turks & Caicos),  Matthew Bagley (Hong Kong), Martin Toha (Cyprus), and Peter de Costa Brum (Bahamas).  These individuals are included as "participants" in Arnold's money laundering conspiracy because they were "criminally responsible for the commission of the offense" even if they were not convicted of the offense.  U.S.S.G. § 3B1.1, App. N.1. Regardless of the precise number of individuals involved in the offense, there can be no argument that Arnold's international money laundering conspiracy, which involved multiple layered transactions among a series of sophisticated shell corporations in at least eight foreign countries, most of which were known money laundering havens, was not "otherwise extensive." U.S.S.G. § 3B1.1(a).  As discussed above, Arnold played the primary role in organizing the movement of funds, even for accounts that were not held in his name.  *See* Ex. 2.

        8.      Acceptance of Responsibility

Arnold should not receive an adjustment for acceptance of responsibility.  Contrary to his statement to the probation officer, Arnold's defense at trial was not solely that "he believed the admitted facts did not show guilt under the law."  PSR ¶ 54.  To the contrary, Arnold put the United States to its burden of proof at trial by denying the essential factual elements of guilt.  For example, Arnold contested the following facts, among many others:

(1) Arnold denied that he possessed the *mens rea* for the offense - that he knew the drugs were distributed outside the usual course of professional practice and not for a legitimate medical purpose.  *See, e.g.*, Ex. 3 at 2742 ("They [the government] have not proven that Mike Arnold intended that these prescriptions be issued outside the usual course.  And they have not proven that Mike Arnold intended the prescriptions be issued not for a legitimate medical purpose."); 2767-2771 (denying that Arnold attempted to conceal his identity and his connection to Pitcairn); 2772 ("[T]he Government sure hasn't proven beyond a reasonable doubt that Mike Arnold believed what he was doing was illegal").

U.S. SENTENCING MEMORANDUM
CR 10-0642 CRB           9

(2) Arnold denied that the drugs distributed by Pitcairn were not issued for a legitimate medical purpose. *See, e.g.,* Ex. 3 at 2782-2785 (arguing that the patients who testified at trial had a legitimate medical need for the drugs distributed by Pitcairn).

(3) Arnold denied that he was the owner and manager of Pitcairn. Instead, Arnold introduced evidence and argued that he was a "consultant" who was hired by his co-conspirator Diego Paes, a fugitive who he claimed was the true mastermind behind Pitcairn. As discussed above, the evidence at trial demonstrated that Arnold was in fact the owner and leader of Pitcairn, the person who made the most money from its operations, and the person who made key decisions and managed key relationships for the illegal business. Arnold's denial of his true role in the offense, which he continues to assert to this day, is inconsistent with acceptance of responsibility and required the United States to introduce significant evidence of his true role at trial. *See* Ex. 3 at 285-86 (arguing that Paes recruited Arnold as a "technology guy" who "had computer experience" to join Pitcairn); 1915-20, 1937 (introducing evidence that Arnold purportedly was a technology consultant to Pitcairn, rather than the owner and operator as proved at trial); 1922-23 (introducing evidence purporting to show that Diego Paes was in charge of Pitcairn); 2199 (introducing evidence purporting to show that Arnold was an "IT consultant"); 2205-09 (introducing evidence purporting to show that Arnold's income from selling drugs through Pitcairn was generated from "consulting").

(4) Arnold contested that he wrote many of the e-mails demonstrating that he was aware that his conduct was illegal and that he was not relying on the judgment of doctors and pharmacists as he claimed in his defense. Arnold's denial that he was the author of these e-mails required the United States to put on extensive proof at trial, including expert testimony, tying Arnold to the damaging statements made in them. *See* Ex. 3 287 (attributing an e-mail pressuring a doctor to approve more orders to "Pitcairn" rather than admitting that Arnold wrote the e-mail); 1549 (declining to stipulate that Arnold used the e-mail account tech@pitcairngroup.com); 1574-75 (refusing to stipulate that Arnold sent an incriminating e-mail); 2323-27, 2329-30 (not acknowledging that Arnold sent incriminating e-mails to Dr.

Valdivieso and contesting that the e-mails were meant to pressure the doctor to approve more orders).

(5) Arnold denied that his 2003 SPAM e-mail business was part of his continuing Internet pharmacy activity. *See* Ex. 3 at 932 (arguing that 2003 e-mail advertising business was "different" from Arnold's Internet pharmacy business and "entirely legal").

(6) Arnold contested that he attempted to conceal his identity and his connection to Pitcairn and the money he earned from his illegal business. Arnold's denial of these facts required the United States to introduce evidence that he was in fact the person behind many of the aliases used to run Pitcairn and tracing money that had been placed in accounts in the names of other people to Arnold. *See* Ex. 3 at 1748 (cross-examination implying that Arnold was registering Pitcairn-related domain names for others, instead of for himself); 1545-46, 2277, 2402 (introducing evidence that Arnold gave money to a jewelry shop owner as an "investment" in a jewelry business rather than to launder the money and hide the illegal source of the funds); 2383-2388, 2395-2397 (contesting that Arnold tried to conceal the source of his income).

As these few examples show, Arnold did not stipulate to the essential factual elements of the offense, but instead vigorously contested whether he possessed the *mens rea* to commit the offense, whether Pitcairn distributed drugs to patients who had no medical need for them, his role in Pitcairn, his efforts to conceal his connection to that illegal business, and whether he made incriminating statements demonstrating his knowledge that his conduct was illegal. These actions required the United States to introduce three weeks of testimony from over 35 witnesses to prove the essential factual elements of the crime and Arnold's role in it. This conduct is inconsistent with acceptance of responsibility.

## C.    18 U.S.C. § 3553(a) Factors

### 1.    Nature and Circumstances of the Offense

The nature of the offense is serious: the defendant distributed millions of doses of addictive and dangerous controlled substances to thousands of people located throughout the United States without the medical supervision necessary to ensure that the persons ingesting the

drugs did so safely and responsibly. In many cases, the "doctor" who purportedly authorized the prescriptions was not a doctor at all but someone who had stolen the identity of Dr. Hassan Gaafar. By requiring no medical review of drug requests or supervision of patients once drugs were distributed to them, the defendant's business model ensured that people could and would obtain controlled substances for no reason other than that they wanted them and did nothing to prevent drug addicts from obtaining potentially lethal quantities of dangerous drugs. Indeed, his business model depended on providing his customers with as many drugs as they wanted as often as they wanted them. The use of the Internet to sell drugs increased exponentially the number of customers Arnold's drug trafficking organization had the capacity to reach, eventually distributing at least 12 million doses of controlled substances to thousands customers located throughout the United States. The defendant profited handsomely, personally earning over $10 million from the sale of $44 million worth of drugs over a 4 year period. In just one year of operation, the defendant went from being bankrupt to owning a Ferrari and a $9 million house.

> ### a.    Death or Serious Bodily Injury

The defendant distributed large quantities of life-threatening drugs with no controls to ensure the safety of his drug customers. As a result, the defendant's illegal conduct resulted in the death and serious injury of countless persons. The defendant primarily distributed large quantities of two types of drugs: benzodiazepenes (e.g. Xanax, Vallium) and stimulants (e.g. phentermine, phendimetrazine). Benzodiazepenes are central-nervous system depressants that can cause the heart and lungs to cease functioning when taken in sufficient quantities.[8] Moreover, once addicted to Xanax, sudden withdrawal can cause life-threatening seizures. Stimulants such as phentermine can cause increased blood pressure, pulmonary arterial hypertension, and, eventually death. All of these drugs are subject to physical and psychological addiction. Once, addicted, a person requires increasing quantities of the drugs to achieve the

---

[8]    The facts regarding the effects of the controlled substances distributed by Arnold and their link to serious injury and death are taken from he trial testimony of Dr. Elinor McCance-Katz. *See generally,* Ex. 4.

U.S. SENTENCING MEMORANDUM
CR 10-0642 CRB                    12

desired effect. Without adequate safeguards that were utterly lacking in the defendant's business model, addicts can and will take increasingly large quantities of these drugs until, eventually, they may overdose and die. As a result, the defendant's conduct by its very nature carried a substantial likelihood that it would result in the death and serious bodily injury of his drug customers. *See United States v. Yi*, __ F.3d ___, 2013WL11890 (9th Cir. Jan. 2, 2013), Slip. Op. p. 11 (finding that the district court did not clearly err in concluding that the defendant's conduct created a substantial likelihood of death or serious injury based on the danger of inhaling any form of asbestos and the defendant's employees' failure to take any precautions to prevent asbestos from contaminating the area during removal).

Although the defendant's conduct undoubtedly led to countless deaths, hospitalizations and serious medical complications, the measures the defendant put in place to hide his identity and shield his operations from law enforcement scrutiny make it difficult to link particular deaths and injuries directly to the defendant's operation. The defendant used affiliate marketers whose websites provided barrier between the defendant and his drug purchasers. He periodically changed domain names and e-mail addresses, making it difficult to trace particular drug shipments to the defendant's operation. Moreover, addicts frequently ordered drugs from multiple sites and overdosed on a combination of drugs obtained from different sources, making it difficult to conclusively attribute a person's death to a single Internet pharmacy. Nevertheless, there exists clear evidence that the defendant's criminal operation contributed to the overdose deaths of at least three known persons: Evan B., Jack T., and David S.

*Evan B.* - Robert B. found the body of his dead son Evan B. on March 16, 2006. The medical examiner's report indicated that Evan B.'s death was "due to multiple substance intoxication with lethal levels of propoxyphene and alprazolam." Ex. 5. Lorazepam (Ativan) was also one of the drugs found in Evan B.'s system upon his death. *Id*.

Robert B. told investigators that his son was a paranoid schizophrenic who was addicted to drugs that he ordered over the Internet. Ex. 6 at NAP-00001622-23; NAP-01500166-167. Mr. B. stated that he had gone through sometimes extreme efforts to stop the flow of drugs from

Internet pharmacies to his son, including cancelling his son's credit cards and waiting outside his son's apartment to intercept shipments of drugs delivered by FedEx and other shipping services. *Id*.

Evidence found in Evan B.'s apartment and on his computer indicated that Evan B. was able to circumvent his father's efforts by using multiple credit cards and having drugs sent to hotels rather than his home. The evidence also revealed that Evan B. ordered controlled substances from Arnold's Internet pharmacy Pitcairn (telephone number 800-242-5942) that were delivered by co-defendant Herholz's fulfillment pharmacy Kwic Fill. Ex. 6 at NAP-00001623. Evidence found on Evan B.'s computer indicated that he had visited crownpills.com, one of Pitcairn's websites, 117 times, with the last visit on March 14, 2006, two days before his death. Ex. 7. Evidence found on his computer also indicated that Evan B. had purchased at least one order of Lorazepam (Ativan) and two orders of Xanax (Alprazolam) from Pitcairn. Ex. 8. Both of these drugs were found in Evan B.'s body upon his death. Ex. 5. Evan B.'s credit card records reflected charges for drugs ordered from Pitcairn on March 3, 9, and 10 of 2006, only days before his death on March 16. Ex. 9. FedEx records indicated that Kwic Fill shipped drugs to Evan B. that were ordered from Pitcairn on March 3 and 10, 2006. Ex. 10. Kwic Fill records reflect an order for Lorazepam (Ativan) that was filled on March 10, 2006. Ex. 11. This is one of the drugs that was found in Evan B.'s blood upon his death. Ex. 5.

*Jack T.* - On November 8, 2005, when he was 17 years old, Travis T. found the body of his father, Jack T., in his father's home after his father died from an apparent drug overdose. Ex. 12 at NAP-00002729. Travis T. told investigators that his father was addicted to drugs that he ordered over the Internet. *Id*. Travis stated that he sometimes ingested pills with his father when he went to visit his father on weekends. *Id*. Officers investigating Jack T.'s death found pill bottles, shipping packages, and drug information sheets indicating that Jack T. ordered and received several different types of drugs from Pitcairn, including clonazepam and alprazolam (Xanax), both Schedule IV controlled substances. *Id*. at NAP-00002741-42. Officers found e-mails sent from the same e-mail address (cs@pitcairngroup.com) that sent confirmation e-mails

to agents who made undercover purchases from Arnold's pharmacy Pitcairn. *Id*. at NAP-00002735-36; 2741-42. In addition, the same company (EchoRx) was identified as the "merchant" on the credit card bills for the purchases made by Mr. T. and those made by the undercover agents. *Id*. The same customer service number, (800) 242-5942, was also listed on the e-mails and pill bottles. *Id*. One of the e-mails indicated that Mr. T. had placed an order for Alprazolam (Xanax) from Pitcairn on November 3, 2005, five days before his death. *Id*. Optimal Payments records for credit card purchases from Pitcairn indicate that T.'s credit card was charged for drugs purchased from Pitcairn on September 19, October 10, 19, and 28 and November 9, 2005. Ex. 13.

*David S.* - On August 31, 2006, David S., age 25, was found dead on his bedroom floor. Ex. 14 at NAP-00070391. The cause of death was determined to be cardisoprodol poisoning. *Id*. at NAP-00070383. A prescription for cardisoprodol authorized by Alfred Valdivieso was found at Rock Canyon pharmacy in Rock Canyon, Utah, one of the fulfillment pharmacies for Pitcairn. Ex. 15 at NAP-01050001; NAP-00091059 - 91060. David S.'s credit card was charged for drug orders filled by Pitcairn on August 28 and 29, 2006, only days before his death. Ex. 16.

By feeding the addictions of these three men, Pitcairn contributed to their increased tolerance, which let to their eventual overdose and death. Evidence that each of these men ordered the very drugs on which he overdosed from Pitcairn only days before he died clearly demonstrates that Arnold's illegal sale of controlled substances to Evan B., Jack T. and David S. contributed to their untimely deaths.

         2.    History and Characteristics of the Defendant

The defendant is an educated person with significant computer programming skills. Unlike many defendants convicted of drug trafficking crimes, he is not a person whose life circumstances encouraged a life of crime or left him with few options other than selling drugs to make a living. Rather than use his knowledge and skills to pursue a lawful career, the defendant has chosen to put his talents to work for criminal ends. His current conviction is not an isolated incident but is now the second time he has been convicted of computer-related crimes.

On June 21, 1994, Arnold was convicted of violating 18 U.S.C. §§ 1029 (access device fraud) and 1030 (computer fraud) based on the theft of information from Credit Bureau, Inc. (CBI), a credit and background information service. Ex. 17. Arnold "hacked" into the CBI computer system and obtained the names, addresses and credit card numbers located in the database of persons who lived near his home in Michigan. *Id*. at NAP-00140199. Arnold used this information to order computer equipment in the names of the persons whose identities and credit card numbers he had stolen. *Id*. He employed at least three other people to help place orders for the computer equipment, retrieve the computer equipment from the UPS office where it was being held and help him to sell the equipment. *Id*. at NAP-00140195-198. Arnold managed to fraudulently acquire over $10,000 worth of computer equipment by the time he was caught and convicted. *Id*. at NAP-00140199.

3.    Seriousness of the Offense, Respect for the Law, Just Punishment, Adequate Deterrence, Protection of Public, Rehabilitation of Defendant

The defendant made over $10 million in 4 years selling addictive and dangerous drugs to without any safeguards to protect the health and well-being of the customers who were ordering drugs from his website or their friends, family members and people in their communities who would be affected by their behavior. Because of the large amount of profit that can be made from the illegal sale of drugs over the Internet, and the relative anonymity with which this crime can be perpetrated, a serious prison sentence is necessary to sure adequate deterrence, promote respect for the law, protect the public and account for the seriousness of the offense. *See Gall*, 552 U.S. at 54 (noting the government's "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law"). The concern about disrespect for the law is even more prevalent in this type of case than in other drug or fraud cases because here it is clear that Arnold was aware that his conduct was illegal but chose to take the risk that he would be caught, betting that the small amount of jail time he likely would face would be balanced by the extreme profit he stood to gain from selling "only" Schedule III and IV drugs over the Internet. It is imperative that others contemplating entering the lucrative business of illegal Internet drug

trafficking understand that the calculation of jail versus money will not come out in their favor. The defendant has shown himself to be a talented computer programmer with no respect for the law who gambled that the amount of money he made would outweigh the disruption to his life from the short prison term he hoped to receive if he were caught. The Court should reject his plea for a time-served sentence and instead impose a sentence of imprisonment that will deter others like Arnold from committing the serious crimes of which he was convicted.

4.    Sentencing Commission Policy Statements

Under the Sentencing Commission's policy statement set forth in § 5K2.1, "[i]f death resulted, the court may increase the sentence above the authorized guideline range." U.S.S.G. § 5K2.1 (2006). Similarly, an upward departure may be warranted where "significant physical injury" or "extreme psychological injury" occurred as a result of the offense. *See* U.S.S.G. §§ 5K2.2, 5K2.3 (2006). In this case, there is substantial evidence linking drugs distributed by Arnold to identifiable deaths caused by drug overdose.

5.    Unwarranted Sentencing Disparity

The concern for unwarranted sentencing disparity is largely addressed by sentencing a defendant to within the correctly-calculated Guidelines' range. See *Gall*, 552 U.S. at 54 ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges. Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."); *United States v. Jones*, 696 F.3d 695 (7th Cir. 2012) ("Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly.") (quotation omitted). The defendant's call for the Court to impose a sentence that is a substantial variance from the Guidelines' range based on a unscientific review of supposedly "similar" cases should be disregarded. The defendant makes no effort to compare his conduct and history to others who distributed similar quantities of drugs, profited in a similar order of magnitude from their conduct, made similar efforts to avoid law enforcement detection, have a similar criminal history, and declined to plead

guilty or cooperate with the United States.

For example, the defendants in the United Care Pharmacy matter each pled guilty prior to trial, without extensive litigation, and agreed to cooperate with the United States. Similarly, Robert Smoley, who received a sentence of 40 months of imprisonment, entered into a pre-indictment disposition in which he accepted responsibility for his conduct and resolved his case without any litigation.

Even if it were the case that the defendant could be compared to these other individuals, "[a]voiding 'unwarranted' disparities. . . is not the summum bonum in sentencing. Other objectives may have greater weight, and the court is free to have its own policy about which differences are 'unwarranted.'" *United States v. Bartlett*, 567 F.3d 901, 908-09 (7th Cir. 2009). The defendant asks for a sentence that is 123 months below the low end of a properly-calculated Guidelines' range based largely on the idea that any other sentence would cause an "unwarranted disparity" with sentences for conduct that does not compare in seriousness or scope with his own.

Moreover, the Court must be conscious of the need "to avoid unwarranted similarities among other co-conspirators who were not similarly situated." *Gall*, 552 U.S. at 55 (emphasis in the original). The defendant's sentence should not be compared to others whose crimes involved less egregious conduct, who lack criminal history, who entered timely guilty pleas or who cooperated with the United States. *Ressam*, 679 F.3d at 1095 ("We agree and reject the comparison of Ressam's sentence to defendants who pleaded guilty or were convicted of much less serious offenses.").

6.    Restitution

The United States has requested that a forfeiture judgment of $69,692,488.39 be entered in this matter that would strip the defendant of the ill-gotten gains of his illegal conduct. Any funds that are recovered will be used to make restitution to any identifiable victims of the defendant's crime.

///

///

U.S. SENTENCING MEMORANDUM
CR 10-0642 CRB                                    18

**CONCLUSION**

For the reasons discussed above, the United States respectfully requests that the Court impose a sentence of 120 months of imprisonment, followed by 3 years of supervised release, an appropriate fine and a $600 special assessment. The United States further requests that the Court order that the defendant forfeit $ 69,692,488,39 in criminal proceeds, including the specific accounts and assets identified in the Court's Preliminary Order of Forfeiture, dated December 31, 2012, as amended on January 4, 2013, at Docket Numbers 1092 and 1094.

DATED: January 18, 2013                    Respectfully submitted,

                                           MELINDA HAAG
                                           United States Attorney

                                                 /s
                                           _____
                                           KIRSTIN M. AULT
                                           Assistant United States Attorney

U.S. SENTENCING MEMORANDUM
CR 10-0642 CRB                      19